# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

**CHARLES RAY LINDSEY**             **CIVIL ACTION NO. 3:13CV2912**
**LA. DOC #564560**

                                    **SECTION P**
**VERSUS**

                                    **JUDGE ROBERT G. JAMES**

**WARDEN TIM KEITH**                **MAGISTRATE JUDGE HAYES**

### REPORT AND RECOMMENDATION

*Pro* se Petitioner Charles Ray Lindsey, an inmate in the custody of Louisiana's

Department of Corrections, filed the instant Petition for writ of *habeas corpus* pursuant to 28

U.S.C. § 2254 on October 18, 2013.  [doc. #s 1, 11].  Petitioner attacks his 2010 convictions for

aggravated arson and unauthorized entry of an inhabited dwelling, as well as the sentences

imposed by the Fourth Judicial District Court, Ouachita Parish.  This matter has been referred to

the undersigned for review, report, and recommendation in accordance with the provisions of 28

U.S.C. § 636 and the standing orders of the Court.

### Background

The underlying facts in this case have been set forth by the Louisiana Second Circuit

Court of Appeal as follows:

> In the summer of 2009, Debra Pesina and her two children lived in an apartment at
> the Westbrook Villa complex in Monroe, Louisiana. She was dating the defendant,
> Charles Lindsey, but she lived with a male roommate with whom she did not have
> a romantic relationship. Both Pesina and Lindsey are white; her former roommate is
> African–American.
>
> At the beginning of August, Lindsey moved into the apartment and Pesina's
> roommate moved out at Lindsey's request. Pesina was the only lessee; Lindsey never
> signed a lease. Once Lindsey moved in, the couple argued frequently, and the
> apartment manager received complaints of "yelling" and "screaming" between Pesina

and Lindsey from the other tenants.

On August 21, 2009, Lindsey demanded that Pesina drive him to the liquor store. Pesina testified at trial that on the way to the liquor store, Lindsey asked her, "Are you f* * * * *g that n* * * *r?" They continued to argue during the drive and later, at home, while Pesina was cooking Lindsey's meal. Pesina had to run a shopping errand, and while she was away from the apartment, she came to the conclusion that she did not want Lindsey living with her any longer. Thus, she contacted the apartment manager and the West Monroe Police Department (the "WMPD"), and officers met Pesina at the apartment at about 5:00 p.m. A police officer told Lindsey that he had to leave the premises, and Lindsey took only his bottle of Old Charter whiskey with him as he left. The responding officer saw that Lindsey was drunk, and he drove Lindsey to the nearby police station. There, the defendant called his aunt, Barbara Aswell, to come and pick him up.

After Lindsey was taken from the apartment, Pesina also left the apartment and drove to the workplace of her former roommate to talk with him. While she was there she got a cell phone call. Her phone's caller ID indicated that the call came from her apartment. The caller initiating the call from her apartment was the defendant. She testified that Lindsey said, "I told you I'd get even with you and I told you I'd get you." Pesina told the defendant, "Oh, really? Well, I got you," and hung up the phone. Pesina then called the police again, and an officer met her at the apartment at about 7:15 p.m. Lindsey was not present, but one of the rear windows was open. Pesina gathered some personal items and left to stay with a friend in Tallulah.

Meanwhile, when Aswell arrived at the police station to pick up Lindsey, she could not find him, so she left to return home. The reason she could not find Lindsey was because he had left the police station and gone to Pesina's apartment. Surveillance video from a convenience store across the street from Pesina's apartment shows that Lindsey entered the store at about 8:35 p.m. The cashier, Heather Hampton, was acquainted with both Lindsey and Pesina, because they frequented the store to buy cigarettes. According to Hampton, on August 21, Lindsey bought only one item: a cigarette lighter. Hampton also testified that the defendant had been drinking and that he said that he was "going to burn the bitch's apartment down," referring to Pesina. She further said that as he left, he said "I'm going to kill the bitch!"

At approximately 9:00 p.m., the fire department was dispatched in response to a report of a fire at the apartment building. The fire was reported by another of the several different residents in the same apartment building where Pesina's apartment was located. Numerous fire and police units responded to the scene.

While Aswell was driving back home, she received another call from Lindsey, who had returned to the police station, asking her to pick him up. After she did so and

2

upon leaving the police station, she saw a number of fire trucks responding to a fire. She wondered aloud where the trucks were going, and Lindsey responded, "I set fire to the apartment." When Aswell expressed doubt about the story, Lindsey said, "If you don't believe me, Aunt Barbara, follow them." She did so and saw that Pesina's apartment was on fire. After being assured that Pesina and her children were not injured, Aswell told police that Lindsey was in her vehicle.

Lindsey was arrested and informed of his *Miranda* rights. In Aswell's vehicle, police found a cigarette lighter, a soft drink, and a bottle of whiskey. Aswell informed the police that the items did not belong to her. Lindsey was placed in the back of a patrol car, which was equipped with a video and audio recording system that recorded all of his statements along with the public safety radio traffic during the time he was in the car. At the beginning of the recording, during questioning, Lindsey denied having left the police station earlier that evening. After a few brief questions, the officers left Lindsey alone in the car. From that point on, the video captured numerous spontaneous and profanity-laced outbursts from Lindsey, sometimes in response to radio traffic:

What the f* * * you got on me? You ain't got s* * * on me.... F* * * y'all man. F* * * the snitches.... Five minutes my mother f* * * * * * ass! ... I love you Aunt Barbara! Stupid bitch! Why'd you tell on me? (Unintelligible) keep your mouth shut! ... Barbara ain't nothing but a f* * * * * * snitch! Barbara's a snitch! ... F* * * * * * bitch.

When an officer returned to the car, Lindsey asked the officer, "Have you got an eyewitness? You ain't got an eyewitness, motherf* * * * *, you ain't got nothing." At one point, without being prompted, Lindsey referred to phone records in reference to proof of his location.

An officer drove Lindsey to the police station for questioning. When Lindsey arrived at the police station, he was *Mirandized* again and interviewed by WMPD Sergeant Christopher Thurmon. According to Sgt. Thurmon, Lindsey smelled strongly of smoke, which did not smell like cigarette smoke.

Lindsey agreed to speak about the incident, and one of the first things he said was, "I did not start the fire." He also said that he had stayed at the police department the entire time from when he first arrived until the time his aunt came to pick him up. Later, Lindsey told the detective that he had "beaten this rap before in another state," and that the police "didn't have any witnesses." Lindsey informed the detective that he was "going to beat it again."

The fire investigator for the City of Monroe, Charlie Simmons, arrived at the apartment complex at about 9:00 p.m. that night. The fire fighters had extinguished

3

the fire by the time he arrived. Officer Simmons examined Pesina's apartment and concluded that the fire started on the couch because that was the only area that had any flame damage. He also observed that there was heat damage inside the kitchen, and he discovered that the front right burner on the electric stove had been left "all the way on." However, Off. Simmons concluded that the stove was not an origin of the fire. He found no evidence that an accelerant was used.

Along with Sgt. Thurmon, Off. Simmons also participated in the interview of Lindsey at the police station, and reported that Lindsey told them that "he'd beat an arson rap before." Like the detective, the investigator reported that Lindsey smelled strongly of smoke that was not cigarette smoke.

Later that night, the fire in Pesina's apartment rekindled. This time, the fire was much larger than the first fire, and ultimately destroyed 16 apartments—essentially the entire building—leaving up to 60 residents without homes. Ultimately, Lindsey was charged by Bill of Information with aggravated arson and the unauthorized entry of an inhabited building.

Lindsey chose to testify at his trial. He said that, on the day of the fire, he probably did ask Pesina if she was having sex with her roommate, but explained that he had been drinking quite a bit that day, he loved Pesina, and "you say things in a jealous rage." However, Lindsey flatly denied having set the fire, saying that he smoked about two packs per day and that he often smoked on the couch in the apartment, sometimes falling asleep with a cigarette in his mouth or hand. He admitted that he had been in the apartment "maybe ... an hour and a half" before the fire. On cross-examination, Lindsey said that he lied to the officers about never leaving the police station because "me and the officers wasn't on the right track and we was arguing all night long." He said that he was only joking when he told the convenience store clerk and his aunt about his role in the fire.

*State v. Lindsey*, 60 So. 3d 566, 567-70 (La. App. 2 Cir. 2011).

On September 25, 2009, Petitioner was charged by bill of information with one count of aggravated arson and one count of unauthorized entry into an inhabited dwelling. [doc. # 19-1, p. 40]. On February 10, 2010, a jury found Petitioner guilty as charged on both counts. [doc. # 19-2, p. 59-60]. On August 30, 2010, the trial judge sentenced Petitioner to serve consecutive sentences of twenty (20) years at hard labor for arson and six (6) years at hard labor for unauthorized entry. *Id.* at 67-68. The judge ordered the first two years of the arson sentence to

be served without benefit of parole, probation, or suspension of sentence.  *Id.* at 67.

On January 28, 2011, Petitioner appealed to the Louisiana Second Circuit Court of Appeal and raised the following assignments of error: (1) the State failed to prove the *corpus delicti* of aggravated arson; (2) insufficient evidence; (3) the trial court erred when it denied his motion for a mistrial; and (4) the trial court erred by admitting certain photographs into evidence. [doc. # 19-5, p. 59].  On May 18, 2011, the appellate court affirmed Petitioner's convictions. *Lindsey*, 69 So. 3d at 566.  Petitioner did not seek further direct review before the Louisiana Supreme Court.

On December 1, 2011, Petitioner filed a *pro se* application for post-conviction relief in the trial court and raised the following assignments of error: (1) ineffective assistance of counsel; (2) improper denial of a preliminary hearing; (3) wrongful conviction due to the negligence of the fire department; (4) the bill of information was invalid and defective; (5) the trial court erred in accepting a convicted felon as a witness; (6) the trial court erred in rejecting a motion for mistrial; (7) excessive sentence; (8) the trial court erred by failing to inform the jury or Petitioner that it was accepting the use of a prejudicial comment and prejudicial photographs; (9) the trial court failed to prove the *corpus delicti* of aggravated arson; (10) insufficient evidence; (11) the State did not produce any of the tenants that lived in the apartment complex; (12) the State withheld exculpatory evidence; (13) the trial court erred in admitting a falsified police report; and (14) the trial court erred in admitting video footage taken from the patrol car.  [doc. # 19-6, p. 24].  The trial court denied Petitioner's application on April 2, 2012.  *Id.* at 45.  On May 2, 2012, the trial court issued a supplemental ruling and again denied Petitioner's application.  *Id.* at 51.

Petitioner sought further collateral review before the Second Circuit Court of Appeal on

June 12, 2012.  *Id.* at 57.  On July 19, 2012, the Second Circuit denied Petitioner's application

for relief.  *Id.* at 76.  The Louisiana Supreme Court likewise denied Petitioner's application on

July 31, 2013.  [doc. # 19-7, p. 75].

Petitioner filed the instant Petition on October 18, 2013, requesting relief for the

following claims: (1) insufficient evidence; (2) denial of the right to a preliminary hearing; (3)

ineffective assistance of counsel; (4) failure to establish the *corpus delicti* of aggravated arson;

(5) the trial court erred when it denied his motion for mistrial; and (6) the trial court erred when it

admitted certain photographs.

The matter is now before the undersigned.

### Law and Analysis

**I.      Standard of Review – 28 U.S.C. § 2254**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254,

governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims.

After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is

limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398

(2011).  An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a

6

conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case."  *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## II.  Petitioner's Claims

### A. Claim One: Insufficient Evidence

Petitioner first contends that the evidence presented at trial was insufficient to find him guilty of aggravated arson.  [doc. # 1, p. 5].  He contends that the State failed to prove that he caused the fire, or, more importantly, that he intentionally caused the fire.  *Id.* at 6.  He highlights various portions of testimony to support his claim.  *Id.* at 6-9.

When a *habeas* petitioner asserts that the evidence presented was insufficient to support his conviction, the limited question before a federal *habeas* court is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Jackson v. Virginia*, 443 U.S. 307 (1979).  *Williams v. Puckett*,

7

283 F.3d 272, 278-79 (5ᵗʰ Cir. 2002).  A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  The *Jackson* inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence."  *Gibson v. Collins*, 947 F.2d 780, 783 (5ᵗʰ Cir. 1991).

Here, the Louisiana appellate court properly invoked and applied the *Jackson* standard.  *See Lindsey*, 69 So. 3d at 570-72.  The court began by referencing the definition of aggravated arson under Louisiana law.  *Id.* at 571.  Specifically, LA. REV. STAT. ANN. § 14:51 defines aggravated arson, in part, as "the intentional . . . setting fire to any structure, watercraft, or movable whereby it is foreseeable that human life might be endangered."  The court then set forth the relevant testimony and evidence presented at trial as follows:

> Although earlier in the day of the fire, Lindsey had been driven to the nearby police station, he later placed a call to the victim from inside her apartment, saying, "I told you I'd get even with you and I told you I'd get you." Just prior to the reporting of the fire, Lindsey visited a convenience store across the street from the victim's apartment. At the store, he bought a single item—a lighter—and told the cashier that he was "going to burn the b****'s apartment down."

> Because of the proximity of the police station, the convenience store and the apartment, Lindsey had the opportunity to enter the apartment and start a fire within a short time frame. Next, Lindsey returned to the police station and waited for his aunt to arrive; in the meantime, the fire was reported by a nearby tenant. When Lindsey and his aunt left together, he confessed to his aunt that "I set fire to the apartment" and invited her to verify his claim: "If you don't believe me, Aunt

8

Barbara, follow them." After his arrest, he repeatedly referred to his aunt as a snitch and was upset with her for talking to the police. Moreover, Lindsey, who claimed to have been at the police station the entire time before the fire, smelled strongly of smoke, and, according to the police officer, the smell was distinct from the smell of cigarette smoke.

*Lindsey*, 69 So. 3d at 571-72.

Applying the *Jackson* standard, the appellate court held that the evidence was "plainly sufficient to prove beyond a reasonable doubt that the fire was the result of a criminal act . . . ." *Id.* at 572. The court elaborated: "The facts exclude every reasonable hypothesis of innocence, such as an accidental fire caused by a smoldering cigarette; the single conclusion to be drawn from these facts is that Lindsey deliberately set the fire in order to, in his words, 'get even with' Pesina, who had just evicted him from the apartment. Lindsey's confession had ample corroboration and there was clearly sufficient evidence to convict him of the crimes charged." *Id.*

A review of the state court record shows that the appellate court's application of *Jackson* was not objectively unreasonable. Petitioner's claim for relief based on insufficient evidence should be **DENIED**.

B. <u>Claim Two: Denial of a Preliminary Hearing</u>

Petitioner claims that the trial court, in denying him the right to a preliminary hearing, denied him due process of law. [doc. # 1, p. 10]. He claims that, had he been afforded a preliminary hearing, he would have discovered that the State intended to use certain of his own comments against him, and, consequently, he would have then been able to move to suppress those comments. *Id.* He also claims that a preliminary hearing would have given him an

opportunity to argue that he was never Mirandized prior to making incriminating statements. *Id.* at 10-11.

However, the Fifth Circuit has held that a preliminary hearing is "not a federal constitutional right which, if denied, requires a petitioner's release on habeas corpus." *Murphy v. Beto*, 416 F.2d 98, 100 (5th Cir. 1969); *accord, Scarbrough v. Dutton*, 393 F.2d 6, 7 (5th Cir. 1968) ("The failure to hold a preliminary hearing, without more, does not amount to a violation of constitutional rights which would vitiate the subsequent conviction."). As this claim presents no constitutional violation, it should be **DENIED**.

C. Claim Three: Ineffective Assistance of Counsel

Petitioner alleges that his trial counsel was ineffective for: (1) making prejudicial comments to the jury during closing argument; (2) convincing Petitioner to testify and then causing Petitioner to make certain statements; (3) refusing to comply with a court order; (4) failing to subpoena a witness; and (5) failing to impeach a State witness. [doc. # 1, p. 11-15].

Ineffective assistance of counsel claims may be considered under 28 U.S.C. § 2254. *See Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012); *Amos v. Thornton*, 646 F.3d 199 (5th Cir. 2011). Substandard advice of counsel rises to a constitutional violation only if the substandard conduct deprives the petitioner of his constitutional right to a fair trial or deprives the petitioner of some other constitutional right. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him. *Id.*

If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered. *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997). The prongs of the test also need not be analyzed in any particular order. *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997). Furthermore, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

In applying the first prong of *Strickland*, a court should presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy. *See Strickland*, 466 U.S. at 689-90. The petitioner must show that the performance of counsel fell "outside the wide range of professionally competent assistance." *Id.* at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).

To establish prejudice, the second prong, the petitioner must demonstrate that counsel's actions "were so serious as to render the proceedings unreliable and fundamentally unfair." *U.S. v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984). Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *see also Mangum v. Hargett*, 67 F.3d 80, 84 (5th Cir. 1995). Accordingly, counsel cannot be ineffective for failing to raise a meritless claim, *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995), and prejudice generally exists only if the defendant demonstrates that he would have received less jail time. *U.S. v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004).

    i. Prejudicial Comments to the Jury

11

Petitioner claims that his trial counsel made the following prejudicial comments during closing argument: "Now, I know you don't like Mr. Lindsey.  You can't like him.  I don't even like him.  He's a redneck and he's prejudice[sic], but you need to rise above that."  [doc. # 19-5, p. 36].  Petitioner argues that these comments had an unquestionably powerful and prejudicial impact on the predominantly African-American jury.  [doc. # 1, p. 12].

Respondent argues that, while "somewhat awkward," counsel's purpose was to "exhort the jury to overcome the shared tendency to form pre-conceived notions based on emotional value."  [doc. # 19, p. 23].  According to Respondent, "[t]he relevant portion of the sentence in which counsel refers to Petitioner as 'redneck' and 'prejudice[d]' is[,] 'but you need to rise above that.'"  *Id.*

"The right to effective assistance extends to closing arguments.  Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."  *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (citations omitted); *see also U.S. v. Martinez*, 974 F.2d 589, 591 (5th Cir. 1992) ("The decision respecting closing argument, like many other trial decisions, is a matter of trial strategy.").  This deference is heightened when judicial review is conducted through the federal *habeas* lense.  *Id.* at 6.

The trial court, on collateral review, correctly identified the federal standard for evaluating an ineffective-assistance of counsel claim and then summarily rejected Petitioner's claim.  [doc. # 19-6, p. 46-47].  This Court, upon consideration, cannot say that the trial court's rejection was objectively unreasonable.  When viewed in its entirety, it is clear that counsel's

summation constituted a zealous and competent advocation.  Among other things, counsel implored the jury on multiple occasions to find that the fire was accidental, he recapitulated the evidence and argued that the jury could only reach a guilty verdict if it speculated and assumed facts not in evidence, he attempted to dampen the effect of Petitioner's prior threats, and, while acknowledging the emotional and financial damage that the fire caused, he nevertheless urged the jury to look past that and to instead consider the facts and the State's considerable burden of proof.  [doc. # 19-5, p. 30-36].

To be sure, the portion of counsel's closing argument that Petitioner cites is acerbic; however, Petitioner neglects to present counsel's qualifying statements: "He's a redneck and he's prejudice, but you need to rise above that.  You need to be better than he is and show him that the law protects even people like him because we're going to require the prosecutor in any case to prove an offense regardless of how offensive a defendant might be before we convict them."  *Id.* at 36.  Counsel's "prejudice" comment was made in reference to the racial epithet that witness Pesina testified Petitioner used.

It is apparent that counsel made the comment in an effort to empathize with the predominantly African-American jury.  In this regard, the Court observes that "[w]inning over an audience by empathy is a technique that dates back to Aristotle." *Yarborough*, 540 U.S. at 11 (referencing P. Lagarias, Effective Closing Argument §§ 2.05-2.06, pp. 99-101 (1989) (citing Aristotle's Rhetoric for the point that "[a] speech should indicate to the audience that the speaker shares the attitudes of the listener, so that, in turn, the listener will respond positively to the views of the speaker")); *cf. Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997) ("[C]ounsel may make strategic decisions to acknowledge the defendant's culpability and may even concede that the

jury would be justified in imposing the death penalty, in order to establish credibility with the jury.").

While certainly uncomplimentary, counsel was wagering that his candor would resonate favorably with the jury and cause the jurors to disregard any animus they might have harbored. Counsel's statements do not amount to deficient performance, especially considering his subsequent qualifying statements, the closing argument as a whole, and the deferential standard under which counsel's trial tactics are judged.  It follows that Petitioner fails to demonstrate that the state court's denial of his claim was objectively unreasonable or that he is otherwise entitled to relief on this claim.

ii. Forcing Petitioner to Testify

Petitioner argues that trial counsel forced him to testify and then goaded him into making incriminating statements.  [doc. # 1, p. 12-13].  He contends further that counsel's questioning portrayed him in a negative light and deprived him of a fair trial.  *Id.* at 13.

The following exchange, however, contradicts Petitioner's argument and makes clear that Petitioner was aware of his right to decline to testify and then, despite being so aware, voluntarily made the decision to testify:

Trial Counsel: I will call Mr. Lindsey

Court: You will call Mr. Lindsey?  All right.  Let me, uh, advise Mr. Lindsey here–Again, sir, you have a right to remain silent.  If you choose to remain silent it cannot be held against you in this court.  However, anything you say can be used against you.  You have a right against self incrimination, you cannot force - be forced to give testimony against yourself.  However, if you choose to take the stand you will be subject to cross examination by the State.  You understand that?

Petitioner: Yes, sir.

Court: And considering those factors and those rights are you willing to then take the stand?

Petitioner: Yes, sir.

[doc. # 19-5, p. 4-5].  The state court's decision to deny this claim was not objectively unreasonable.

### iii. Refusing to Comply with a Court Order

Petitioner argues that counsel was "ineffective when he deliberately refused to comply with a court order to secure the petitioner [at] a preliminary hearing."  [doc. # 1, p. 14]. Petitioner explains that, on or about October 13, 2009, Judge Leehy ordered trial counsel to secure Petitioner's attendance at a preliminary hearing, but counsel "never took Petitioner back to court until the morning of trial, February 8th, 2010."  However, Petitioner fails to present or otherwise identify the alleged court order or any other evidence to support his claim.

The record indicates that, on August 24, 2009, Petitioner was present in court and indicated that he desired appointed counsel.  [doc. # 19-1, p. 10].  On September 28, 2009, Petitioner was present in court, waived formal arraignment, and entered a plea of not guilty.  *Id.* at 11.  Finally, on October 20, 2009, Petitioner was again present in court for the court's order resetting a hearing on pre-trial motions.  The record does not show that the trial court, on or about October 13, 2009, issued an order to secure Petitioner's attendance at a preliminary hearing.  This claim is without merit.

### iv. Failure to Subpoena a Witness

Petitioner argues that counsel was ineffective for failing to subpoena Michael Roberts to testify at trial.  [doc. # 1, p. 15].  Petitioner contends that Roberts "could have provided critical

15

testimony that would have put the State's motive for aggravated arson in jeopardy by testifying as to the veracity of the statement that he gave to the police."  *Id.*

Once again, Petitioner objects to counsel's trial strategy.  Claims of uncalled witnesses are not favored in federal *habeas corpus* review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of the content of a prospective witness's testimony are largely speculative.  *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (citing *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)).  "[W]ithout a specific, affirmative showing of what the missing evidence or testimony would have been, a *habeas* court cannot even begin to apply *Strickland*'s standards because it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance."  *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994).

Here, counsel was not ineffective for failing to call Michael Roberts.  Not only does Petitioner fail to affirmatively demonstrate what the testimony would have been, he also fails to show that the witness would have, in fact, testified at trial.  *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir.1985); *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981).  This claim is without merit.

v. Failure to Impeach

Petitioner argues that counsel was ineffective for failing to inform the jury of witness Heather Hampton's prior felony conviction.  [doc. # 1, p. 15].  He contends that counsel should have impeached Hampton and challenged the veracity of her testimony.  *Id.*

16

Upon review, however, Petitioner fails to show that counsel's decision not to impeach the witness was not part of a reasonable trial strategy.  As the Supreme Court explained in *Strickland*:  "Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.  Here, the Court declines to second-guess counsel's decision, and ultimately finds that Petitioner has failed to establish the deficiency prong of *Strickland*. Counsel's failure to present evidence of the witnesses's alleged felony conviction hardly amounts to "error[] so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  *Strickland*, 466b U.S. at 687.

In addition, even assuming that counsel was deficient, Petitioner fails to show that he suffered prejudice.  First, Petitioner does not present any evidence of the alleged prior felony conviction.  Absent a showing that Hampton had such a conviction and that the conviction was available for impeachment purposes, Petitioner cannot demonstrate the requisite prejudice.

Second, Petitioner fails to explain how the presentation of any alleged felony conviction would have undercut the substance of the witnesses's testimony.  Hampton, a cashier at a convenience store frequented by Petitioner, plainly testified that Petitioner bought a lighter and informed her that he was "going to burn down the B's apartment . . . ."  [doc. # 19-4, p. 28-29]. Her testimony was consistent with other evidence concerning the time line of events, the lighter that investigators found in Aswell's vehicle, and other testimony concerning Petitioner's arsonous intent.  There was no question as to Hampton's ability to recognize Petitioner and no

17

evidence tending to show that Hampton had a motive to lie or to place blame on anyone other than the actual perpetrator.  In light of these facts, there is no reasonable probability that, but for counsel's failure to show that Hampton was convicted of a prior felony, the result of the proceeding would have been different.  This claim is without merit.

The totality of the representation that counsel provided was well-within an objective standard of reasonableness.  Moreover, there is no reason to believe that Petitioner was prejudiced due to counsel's failure to impeach witness Hampton.  Accordingly, Petitioner's claims for ineffective assistance of counsel should be **DENIED**.

D. Claim Four: Failure to Establish the *Corpus Delicti* of the Crime

Petitioner argues that the State failed to prove the *corpus delicti* of the crime of aggravated arson.  [doc. # 11, p. 16].  Petitioner cites to Louisiana jurisprudence acknowledging the "'well settled' statement that 'an accused party cannot be legally convicted on his own uncorroborated confession without proof that a crime had been committed by someone; in other words, without proof of the *corpus delicti*.'"  *State v. Davis*, 15 So. 3d 361, 370 (La. App. 2 Cir. 2009) (citing *State v. Willie*, 410 So. 2d 1019, 1029 (La. 1982)).  However, this state rule of *corpus delicti* "has no independent constitutional footing" and is not controlling on collateral review before this Court.  *Autry v. Estelle*, 706 F.2d 1394, 1407 (5th Cir. 1983).  Accordingly, this claim is not cognizable and should be **DENIED**.[1]

E. Claim Five: Denial of Motion for Mistrial

---

[1] To the extent that Petitioner claims the evidence presented at trial was insufficient to sustain his conviction, see Section II(A) *supra*.

Petitioner claims that the trial court erred in failing to grant his Motion for Mistrial.  [doc. # 1, p. 22].  Specifically, he contends that the trial court violated LA. CODE CRIM. PROC. ANN. art. 770, 771, and 775.  *Id.* at 22-23.

As to any violation of the aforementioned Louisiana statutes, the Court notes that Petitioner's claim does not involve consideration of any federal or constitutional law.  "Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law unless a federal issue is also presented."  *Leblanc v. Quarterman*, 2008 WL 2330746 at *6 (N.D. Tex. May 28, 2008); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).  Rather, "[f]ederal habeas corpus review is limited to errors of constitutional dimension . . . ."  *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).  In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court.  *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).  Consequently, review of Petitioner's state law claim is not proper.

Nevertheless, Petitioner does mention that the trial court's denial violated his due process rights.  [doc. # 1, p. 24].  In that vein, the Court observes that a denial of a motion for mistrial only implicates the Constitution if the denial results in a fundamental unfairness that fatally infects the trial.  *Matthews v. Cain*, 2010 WL 3210444, at *16 (E.D. La. July 12, 2010) (citing *Lisenba v. California*, 314 U.S. 219, 236-37 (1941)).  Petitioner explains that the court should have granted a mistrial because a witness used–and the prosecutor elicited– a racial epithet in the presence of a predominantly African-American jury.  *Id.*  Petitioner cites the following colloquy:

> Witness Pesina: There were comments thrown around about I was supposed to be having sex with my roommate.
>
> Prosecutor: Okay.  And what else?

19

Witness Pesina: Uh,-

Prosecutor: If anything?

Witness Pesina: There were prejudice comments about I was supposed to be having sex with him and that he didn't like the fact that he was there and he didn't like pictures of my ex-fiancee being up and it was different things.

Prosecutor: What kind of prejudice comments?

Witness Pesina: He [Petitioner] made a comment, "So, are you-", excuse my language God forbid-

Prosecutor: Okay.

Witness Pesina: "Are you f*****g that n****r", is what he asked me.  And I told him I said, "Why do you have to be like that?"

[doc. # 19-4, p. 37].

Considering the standard above, the Court finds, in light of the overwhelming evidence against Petitioner, that the witnesses's comment did not fatally infect the fairness of Petitioner's trial.  Initially, the Court highlights the fact that the witness was merely repeating a prejudicial phrase that originated from Petitioner's lips.  In addition, the Court agrees with Respondent's statement that, "although the remark contained a highly offensive word, inclusion of Petitioner's remark was necessary because it commenced the series of events that led to the fire and was probative of Petitioner's motive and intent to commit aggravated arson."  [*See* doc. # 19, p. 27]. This claim is without merit and should be **DENIED**.

F. Claim Six: Trial Court Error in Admitting Evidence

Petitioner submits that the trial court improperly admitted evidence of photographs depicting the extent of the damage caused by the second fire.  [doc. # 1, p. 26].  The Court, however, can discern no constitutional allegation.  "In habeas actions, [a federal court] does not

20

sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d

855, 862 (5th Cir. 1998).  Because Petitioner fails to allege any actual constitutional violation, this

claim is not cognizable.

To be sure, "a state trial court's evidentiary rulings will mandate habeas relief when

errors are so extreme that they constitute a denial of fundamental fairness.  Thus, only when the

wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial

will habeas relief be warranted." *Id.* at 862 (citations omitted).  With that in mind, however,

even if Petitioner could show that the photographs were erroneously admitted under Louisiana

law, the Court cannot say that the admission of the photographs played a crucial, critical, or

highly significant role in Petitioner's conviction.  Thus, the Court recommends that this claim be

**DENIED**.

## Conclusion

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of

*habeas corpus* filed by Petitioner Charles Ray Lindsey, [doc. #s 1, 11], be **DENIED and**

**DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by

this Recommendation have **fourteen (14) days** from service of this Report and Recommendation

to file specific, written objections with the Clerk of Court.  A party may respond to another

party's objections within **fourteen (14) days** after being served with a copy of any objections or

response to the District Judge at the time of filing.  A courtesy copy of any objection or response

or request for extension of time shall be furnished to the District Judge at the time of filing.

Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals.  **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  *See* 28 U.S.C. § 2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 30th day of April, 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

22